FILED
2017 Sep-19  AM 10:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| GERMANY DAVIS, LOU MARINO, DONALD ANTHONY, and JOHN HUEY, | ) ) ) | |
| and all others similarly situated, | ) ) | CIVIL ACTION NO._____ |
| vs. | ) ) | JURY TRIAL DEMANDED |
| EQUIFAX, INC. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Germany Davis, Lou Marino, Donald Anthony, and John Huey file this Complaint as a nationwide class action and on behalf of a Subclass of Alabama consumers and a Subclass of Georgia consumers against Defendant Equifax, Inc. ("Equifax" or "Defendant"), on their own behalf and on behalf of all others similarly situated, whose sensitive personal information (including, without limitation, names, Social Security numbers, birth dates, addresses and driver's license numbers) ("SPI") was negligently or recklessly or wantonly exposed to criminal "hackers" who broke into Equifax computer systems and downloaded their personal information.

## PARTIES

1.      Germany Davis ("Davis") Lou Marino ("Marino"), and Donald Ashley ("Ashley") are adult residents and citizens of Tuscaloosa, Alabama. John Huey ("Huey") is an adult resident and citizen of Rome, Georgia.

2.     Equifax is a credit data collection and reporting agency incorporated in Georgia and having its principal place of business at 1550 Peachtree Street NW, Atlanta, Georgia 30309.

## JURISDICTION AND VENUE

3.     This Honorable Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

4.     This Honorable Court also has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 in that Plaintiffs state claims under a federal statute, the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*

5.     Venue is proper in this district in that the Plaintiffs reside and conduct financial and other business transactions involving the use of credit, and Equifax routinely and regularly provides credit information to businesses in this district regarding the Plaintiffs and members of the Class. Furthermore, Defendant has caused harm to Plaintiffs and members of the class who reside in this district.

## FACTS COMMON TO ALL COUNTS

6.     On September 7, 2017, Equifax announced that the personal information of over 140 million United States consumers — virtually every adult United States citizen with a credit history — had been compromised in a cybersecurity breach. Equifax stated in its press release that

a cybersecurity incident potentially impacting approximately 143 million U.S. consumers. Criminals exploited a U.S. website application vulnerability to gain access to certain files. Based on the company's investigation, the unauthorized access occurred from mid-May through July 2017.

7.    Equifax further reported on its website that it

discovered the unauthorized access on July 29 of this year and acted immediately to stop the intrusion. The company promptly engaged a leading, independent cybersecurity firm that has been conducting a comprehensive forensic review to determine the scope of the intrusion, including the specific data impacted.

8.    Unfortunately for Plaintiffs and the Class Members, Equifax waited over one month to inform the public, who are the real victims of the negligent and wanton conduct and other wrongdoing of Equifax. Furthermore, Equifax has not, as of the time of the filing of this Complaint, explained what, if anything, it did to "stop the intrusion" or why it was forced to hire an "independent cybersecurity firm" to accomplish what Equifax should have been doing on a routine and regular basis.

9.    Moreover, *Bloomberg* reported that, after discovery of the breach but prior to informing the public of the breach, key senior executives of Equifax, including its chief financial officer, sold Equifax stock worth almost $1.8 million.

10.    On September 14, 2017, the technology website ZDNet, along with other media outlets, reported that Equifax had revealed that "'The vulnerability was Apache Struts CVE-2017-5638. We continue to work with law enforcement as part of our criminal investigation, and have shared indicators of compromise with law enforcement.'" ZDNet noted that "[f]or its part, Equifax still has not provided any evidence to support the claim.

3

**The cited Apache Struts flaw dates back to March**, according to a public vulnerability disclosure. **Patches were released for the vulnerability, suggesting that Equifax did not install the security updates.** Apache Struts is used across the Fortune 100 to provide web applications in Java, and it powers front-and back-end applications, including Equifax's public website." http://www.zdnet.com/article/equifax-confirms-apache-struts-flaw-it-failed-to-patch-was-to-blame-for-data-breach/ (bold emphasis added).

11.     This shocking revelation that a "patch" released by the producer of the software Equifax blames for the massive data breach would have prevented the breach, had Equifax bothered to install it, underscores that the action, or inaction, of Equifax amounted to a reckless and wanton disregard for the security of the most sensitive information it holds on its servers.

12.     The unconscionable failures of Equifax have exposed virtually every United States person with a credit history to a lifetime of possible identity theft, stolen credit, fake accounts, and other similar actions that inevitably will flow from the malfeasance of Equifax. As the *New York Times* reported, '[u]sing the data stolen from Equifax, identity thieves can impersonate people with lenders, creditors and service providers, who rely on personal identity information from Equifax to make financial decisions regarding potential customers." https://nyti.ms/2xSCMSr.  These thieves can obtain credit cards or even borrow from banks or other financial institutions in the names of the victims — Plaintiffs and members of the Class — who will be charged with debts stemming from this breach after the thieves are long gone.

13.     Moreover, the SPI Equifax's negligence allowed the cyberthieves to steal will no doubt be made available to others, and at least some of the information, *e.g.*, names, addresses,

and social security numbers — may be used by criminals or corrupt foreign entities for years.
The *New York Times* also noted that [i]n recent years, Chinese nation-state hackers have . . .
[made] efforts to build databases of Americans' personal information, which can be used for
blackmail or future attacks.... [and that] [g]overnments regularly buy stolen personal information
on the so-called Dark Web...." *Id.* A real risk exists today that the SPI of the Plaintiffs and Class
Members is at this moment being not only used by the cyber thieves but peddled to others on the
dark web and in other criminal marketplaces.

14.    After the initial news of the breach, Equifax charged consumers ten dollars to
place a freeze on their files. On September 12, 2017, Equifax announced, belatedly, that it would
no longer charge consumers for placing a credit freeze. But this action, like every action Equifax
has undertaken since learning of the breach, is the cyber equivalent of the locking the barn door
after the horse has bolted. Many Class Members have already paid Equifax as well as the other
credit reporting agencies a credit freeze fee of five or ten dollars or more. In addition, freezing
the credit report solely at Equifax is insufficient. As CreditCards.com analyst Matt Schulz told
NBC News on September 12, "A credit freeze is only effective if applied to all three credit
bureaus." Although Equifax has stated it will issue refunds to consumers who paid for the credit
freeze, it has not offered any proof that it has done so.

15.    Equifax has offered a year of free credit monitoring to persons whose SPI were
stolen. This measure is also too little, too late, and in all events, Adam Levin, chairman of
CyberScout, a provider of cybersecurity services, was quoted by the *New York Times* as
observing that "[t]his [credit monitoring] is a one-year solution for an eternal problem." https://
nyti.ms/2wPtl6g.

16.     The variety of crimes identity thieves can perpetrate using the SPI of the Plaintiffs and Class Members is bounded only by their imaginations and the limits of cyberspace. Identity thieves may commit fraud damaging not only the Plaintiffs and Class Members but government entities as well. For example, identity theft provides the means for committing immigration fraud; obtaining a driver's license or identification card in the victim's name; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

17. In nearly every case of identify theft, significant time may pass between the occurrence of the harm and its discovery. A similar lag may occur between when the data are stolen and used, and the data may pass through several unclean hands before use or reside on servers on the dark web or elsewhere before use. Fraudulent use may even occur over a significant number of years and may be perpetrated by a number of different criminals, making the consumer's task and that of law enforcement even more difficult. Once released, the SPI opens a Pandora's box of potential harm to the Plaintiffs and Class Members, little of which can be remedied with such bandaid measures as "credit monitoring."

18. For these reasons, Plaintiffs and Class Members, who are, it should be remembered, virtually every creditworthy adult in the United States, face years or even a lifetime of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their SPI.

19. The damages incurred by Plaintiffs and Class Members were a proximate result of the Equifax Data Breach and Equifax's failure to expend adequate resources to protect Plaintiffs' and

6

Class members' SPI from such a foreseeable breach, as required by various state and federal regulations, industry practices, and the common law.

20.    Equifax failed to establish and implement appropriate measures to ensure the security and confidentiality of Plaintiffs' and Class members' SPI to protect against reasonably foreseeable threats to the security or integrity of such information. On or about September 15, 2017, it was reported that two C-suite officers of Equifax had been "retired" in the wake of the breach. One of those officers was identified as Susan Mauldin ("Mauldin"), whose title at Equifax was "Chief Security Officer." Mauldin, whose job at Equifax was to make certain that the SPI of Plaintiffs and Class Members were secure from cybertheft and security breaches, holds a Bachelor of Arts and Master of Fine Arts in Music and appears to have no academic training whatsoever in computer applications, programming, or security. As of the end of the day on September 15, some person or persons had attempted to scrub information about Mauldin from the internet. Mauldin's LinkedIn profile, for example, had been removed or altered to remove her last name and her academic background.

21. Equifax had the resources to prevent a breach, but deliberately chose not to employ those resources for the purpose of protecting the SPI of the Plaintiffs and Class Members in order to increase profits and make their quarterly profit projections. If Equifax had chosen instead to do the right thing, had it followed regulations and guidelines, and adopted security measures recommended by experts and regulators, the Data Breach and the theft of its customers' SPI would not have occurred. But as Bob Sullivan, a cybersecurity expert, wrote in an Op-Ed article published in the *New York Times* on September 13, 2017: "It has always been cheaper to avoid

investment in security upgrades and instead push the real costs of this system onto victims, who spend hours cleaning up the messes left behind."

22. Equifax has offered no meaningful long-term solutions to the dilemma in which it has placed Plaintiffs and the Class Members, despite the fact that experts in cyber security and criminal activity with regard to financial data recognize that such breaches require years of attention and vigilance. Plaintiffs and Class Members are left to try to protect themselves, through spending their own money and time, from the financial damage Equifax has caused. Equifax has also not offered to cover any of the damages sustained by Plaintiffs or Class members.

23. While the SPI of Plaintiffs and members of the Class has been stolen, Equifax continues to hold the SPI of consumers, including Plaintiffs and Class members, and Equifax has to date offered no assurances that the SPI have been rendered safe. Equifax has demonstrated an inability to prevent a breach or stop it from continuing even after it is detected and has, similarly, demonstrated that its actions even in warning Plaintiffs and the Class Members of the breach were untimely, Plaintiffs and members of the Class have an undeniable interest in insuring that their SPI is secure, remains secure, is properly and promptly destroyed and is not subject to further theft.

## CLASS ALLEGATIONS

24.    The nationwide class represented by the Plaintiffs in this action, of which the Plaintiffs are members, consists of:

All persons in the United States whose sensitive personal information was exposed to unauthorized persons in the data breach announced by Equifax on September 7, 2017 (the "Nationwide Class").

25.    Excluded from the Nationwide Class are: (1) individuals who already have settled a lawsuit, claim, or obtained a judgment against Defendant arising from the wrongdoing complained of in the Complaint or (4) Defendants, their officers, directors, and employees, or any affiliate of Defendants, members of each of their immediate families and each of their legal representatives, heirs, successors or assigns; (5) any entity in which Defendants have or had a controlling interest; (6) all judicial officers in the United States; (7) the undersigned counsel and the members of their immediate families.

26.    Plaintiffs Davis, Marino, and Anthony also represent a subclass of Alabama Class Members defined as

All residents of the State of Alabama whose sensitive personal information was exposed to unauthorized persons in the data breach announced by Equifax on September 7, 2017 (the "Alabama Subclass").

27.    Plaintiff Huey also represents a subclass of Georgia Class Members defined as follows:

All residents of the State of Georgia whose sensitive personal information was exposed to unauthorized persons in the data breach announced by Equifax on September 7, 2017 (the "Alabama Subclass").

The same exclusions apply to the Alabama Subclass and the Georgia Subclass as to the Nationwide Class.

28. The Nationwide Class and the Alabama Subclass and the Georgia Subclass represented by the Plaintiffs are so numerous that joinder of each member of the class and subclass is impracticable.

9

29. The claims of the Plaintiffs, representatives of the class and subclasses, are typical of the claims of the class and subclass. All claims of the class and subclass depend on a showing that the Defendant negligently or recklessly or wantonly failed to protect the personally identifiable information of the Plaintiffs and the Class Members and violated provisions of the Fair Credit Reporting Act and, in the case of the Alabama Subclass, the Alabama Deceptive Acts and Practices Act, and in the case of the Georgia Subclass, the Georgia Fair Business Practices Act, as alleged herein. There is no conflict between the individual named Plaintiffs and other members of the class with respect to this action or with respect to the claims for relief set forth in this Complaint.

30. This action is maintainable as a class under Rule 23(b)(1) of the Federal Rules of Civil Procedure as the facts will show a uniform pattern of conduct by the Defendant that will leave the Court with the task of answering the discreet legal questions as to whether its conduct was negligent or reckless or wanton and whether that conduct violated the Fair Credit Reporting Act and the Alabama Deceptive Trade Practices Act and the Georgia Fair Business Practices Act. Given these questions presented to the Court, maintenance of separate actions against the Defendant would create a substantial risk that adjudication of an individual member of the class would be virtually dispositive of the interests of the other members of the class and substantially impede their ability to protect their interests.

31. This action is maintainable under Rule 23(b)(2) if the Federal Rules of Civil Procedure as the Defendant, through its actions as alleged herein, has acted or refused to act on grounds generally applicable to the class, making declaratory relief appropriate to the class as a whole.

10

32. The requirements of Rule 23(b)(3) are met by the following issues and facts of the case:

a. There are common questions of law and fact involved with this action that affect the rights of each member of the Class, and the relief sought is common to the entire class, namely:

—Whether the Defendants' actions were negligent or reckless or wanton;

—Whether the Defendant's actions violated the Fair Credit Reporting Act;

—Whether the Defendant's actions violated the Alabama Deceptive Trade Practices Act.

—Whether the Defendant's actions violated the Georgia Fair Business Practices Act.

b. A class action is superior to other available methods for the fair and efficient adjudication of the controversy because:

—the Class Members have little interest in or ability to bring separate actions as their individual monetary losses are relatively small.

—it is desirable to concentrate all claims relating to the uniform business practice of the Defendants in one judicial forum.

—there are no foreseeable difficulties likely to be encountered in the management of this class action in that the Defendant has records indicating: (1) the number of Class Members; (2) the identities of the members of the Nationwide Class and the Alabama Subclass and the Georgia Subclass

33. The Plaintiffs will fairly and adequately represent the interests of the Class and Subclasses as the Plaintiffs are members of the class and subclasses, the Plaintiffs' claims are

11

typical of those in the class and subclasses, and there are no conflicts between the claims of the Plaintiffs and the claims of other members of the class and subclasses.

34. The attorneys for the Plaintiff are experienced and capable in litigation in the field of class actions and in the fields of consumer protection, debt collection, and credit reporting.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (ON BEHALF OF PLAINTIFFS AND THE NATIONWIDE CLASS; ALTERNATIVELY, PLAINTIFFS AND THE ALABAMA AND GEORGIA SUBCLASSES)

35. Plaintiffs restate and reallege all preceding factual allegations as if fully set forth herein.

36.     When it accepted and stored the SPI of Plaintiffs and Class Members as a part and parcel of its business model and with the intention of profiting therefrom, Equifax affirmatively undertook and owed a duty to Plaintiffs and Class Members to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Equifax knew that the SPI was sensitive, private, and confidential and that the SPI would be valuable to criminals and rogue governments, and therefore, its databases could be targeted by such persons.

37. Equifax owed a duty of care not to subject Plaintiffs and Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

38. Equifax owed numerous additional duties to Plaintiffs and to members of the Nationwide Class and Alabama and Georgia Subclasses, including the following:

   a) To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting SPI in its possession;

   b) To protect SPI using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

   c) To implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

39. Equifax breached its duty to Plaintiffs and the Class Members to adequately protect and safeguard SPI by knowingly disregarding industry standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured SPI. Equifax failed to provide adequate supervision and oversight of the SPI with which they were and are entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party or parties to gather the SPI of Plaintiffs and Class Members, misuse the SPI and intentionally disclose it to others without consent.

40. Equifax knew, or should have known, of the risks inherent in collecting and storing SPI, the vulnerabilities of its data security systems, and the importance of adequate security. Equifax knew about numerous, well-publicized data breaches, including the breaches at Experian, Yahoo, eBay, Sony, Heartland Payments Systems, Target Stores, JP Morgan Chase, TJX Companies, Anthem, RSA Security, and the United States Office of Personnel Management.

41. Equifax knew, or should have known, that their data systems and networks did not adequately safeguard Plaintiffs' and Class Members' SPI.

13

42. Equifax breached its duties to Plaintiffs and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard SPI of Plaintiffs and Class Members.

43. As a direct and proximate result of Equifax's conduct, Plaintiffs and the Class suffered damages including, but not limited to: damages arising from unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the SPI of Plaintiffs and Class Members; damages arising from Plaintiffs' inability to use their debit or credit cards because those cards were cancelled or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including, but not limited to late fee charges and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can be assessed only after a thorough investigation of the facts and events surrounding the data breach.

## COUNT II
## NEGLIGENCE PER SE
## (ON BEHALF OF PLAINTIFFS AND
## THE NATIONWIDE CLASS;
## ALTERNATIVELY, PLAINTIFFS AND THE ALABAMA AND GEORGIA
## SUBCLASSES)

44. Plaintiffs restate and reallege all preceding factual allegations as if fully set forth herein.

45. Section 5 of the Federal Trade Commission ("FTC") Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Equifax, of failing to use reasonable measures to protect SPI. FTC publications and orders, of which Equifax was well aware, also form part of the basis of Equifax's duty in this regard.

90. Equifax violated Section 5 of the FTC Act by failing to use reasonable measures to protect SPI and not complying with applicable industry standards, as described in detail herein. Equifax's conduct was particularly unreasonable given the nature and amount of SPI it obtained and stored, and the foreseeable consequences of a data breach at a corporation such as Equifax, including, specifically, the immense damages that would result to Plaintiffs and Class Members.

46. Equifax's violation of Section 5 of the FTC Act constitutes negligence per se.

47. Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

48. The harm that occurred as a result of the Equifax Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and

15

avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

49. As a direct and proximate result of Equifax's negligence per se, Plaintiffs and the Class have suffered, and continue to suffer, injuries damages arising from Plaintiffs' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charges and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

## COUNT III
## WANTON CONDUCT
## (ON BEHALF OF PLAINTIFFS AND
## THE NATIONWIDE CLASS;
## ALTERNATIVELY, PLAINTIFFS AND THE ALABAMA AND GEORGIA
## SUBCLASSES)

50.     Plaintiffs restate and reallege the preceding factual allegations as if fully set forth herein.

51.     Equifax conducted its security procedures with regard to storing and safeguarding the SPI with a reckless or conscious disregard of the rights and safety of Plaintiffs and Class Members.

52.     Equifax operated its business, specifically in regard to its failure to safeguard the SPI, in a careless, reckless and insecure manner, failing to exercise ordinary care and diligence. Moreover, Equifax failed to adequately secure the SPI against breaches with reckless indifference to the consequences of such failure, and indeed Equifax was aware from its knowledge of standard practices in the credit industry as well as its knowledge of data storage, cyber security, and the vulnerabilities of Web-connected computer systems, that their conduct would probably result in injury to Plaintiffs and the Class Members.

53.     No better demonstration of the reckless or conscious disregard of the rights or safety of the Plaintiffs and Class Members could be exhibited as:

(1) Equifax knew of the previous data breaches in its industry and similar industries which collect large amounts of consumer data as alleged above.

(2) Equifax first knew in July of 2017 or earlier that the SPI had been breached but failed to timely disclose that information to the public, including the Plaintiffs and Class Members,

17

until September 7, 2017. During that at least two-month time period, Equifax allowed cyber thieves to keep and distribute the SPI but took no action to warn the victims of the breach;

(3) after learning of the data breach but before the breach was disclosed to the public, high-ranking corporate officers of Equifax took advantage of their insider knowledge of the breach and profited therefrom by selling almost $1.8 million worth of Equifax stock, knowing that once the public became aware of the breach, the value of the stock would plummet.

54.     Wherefore, the premises considered, Plaintiffs are entitled to recover actual and punitive damages, costs, and attorneys' fees.


## COUNT IV
## WILLFUL VIOLATION OF THE FAIR CREDIT REPORTING ACT ("FCRA")
## (ON BEHALF OF PLAINTIFFS AND
## THE NATIONWIDE CLASS;
## ALTERNATIVELY, PLAINTIFFS AND THE ALABAMA AND GEORGIA
## SUBCLASSES)

55. Plaintiffs restate and reallege all preceding factual allegations as if fully set forth herein.

56. As individuals, Plaintiffs and Class member are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

57. Under the FCRA, a "consumer reporting agency" is defined as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties . . . ." 15 U.S.C. § 1681a(f).

58. Equifax is a consumer reporting agency under the FCRA because, for monetary fees, it regularly engages in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties.

59. As a consumer reporting agency, the FCRA requires Equifax to "maintain reasonable procedures designed to . . . limit the furnishing of consumer reports to the purposes listed under section 1681b of this title." 15 U.S.C. § 1681e(a).

60. Under the FCRA, a "consumer report" is defined as "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for -- (A) credit . . . to be used primarily for personal, family, or household purposes; . . . or (C) any other purpose authorized under section 1681b of this title." 15 U.S.C. § 1681a(d)(1). The compromised data was a consumer report under the FCRA because it was a communication of information bearing on Class members' credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living used, or expected to be used or collected in whole or in part, for the purpose of serving as a factor in establishing the Class members' eligibility for credit.

61. As a consumer reporting agency, Equifax may only furnish a consumer report under the limited circumstances set forth in 15 U.S.C. § 1681b, "and no other." 15 U.S.C. § 1681b(a). None of the purposes listed under 15 U.S.C. § 1681b permit credit reporting agencies to furnish consumer reports to unauthorized or unknown entities, or computer hackers such as those who

accessed the Nationwide Class Members' SPI. Equifax violated § 1681b by furnishing consumer reports to unauthorized or unknown entities or computer hackers, as detailed above.

62. Equifax furnished the Nationwide Class members' consumer reports by disclosing their consumer reports to unauthorized entities and computer hackers; allowing unauthorized entities and computer hackers to access their consumer reports; knowingly and/or recklessly failing to take security measures that would prevent unauthorized entities or computer hackers from accessing their consumer reports; and/or failing to take reasonable security measures that would prevent unauthorized entities or computer hackers from accessing their consumer reports.

63. The Federal Trade Commission ("FTC") has pursued enforcement actions against consumer reporting agencies under the FCRA for failing to "take adequate measures to fulfill their obligations to protect information contained in consumer reports, as required by the" FCRA, in connection with data breaches.

64. Equifax willfully and/or recklessly violated § 1681b and § 1681e(a) by providing impermissible access to consumer reports and by failing to maintain reasonable procedures designed to limit the furnishing of consumer reports to the purposes outlined under section 1681b of the FCRA. The willful and reckless nature of Equifax's violations is supported by, among other things, former employees' admissions that Equifax's data security practices have deteriorated in recent years, and Equifax's numerous other data breaches in the past. Further, Equifax touts itself as an industry leader in breach prevention; thus, Equifax was well aware of the importance of the measures organizations should take to prevent data breaches, and willingly failed to take them.

65. Equifax also acted willfully and recklessly because it knew or should have known about its legal obligations regarding data security and data breaches under the FCRA. These obligations are well established in the plain language of the FCRA and in the promulgations of the Federal Trade Commission. See, e.g., 55 Fed. Reg. 18804 (May 4, 1990), 1990 Commentary On The Fair Credit Reporting Act. 16 C.F.R. Part 600, Appendix To Part 600, Sec. 607 2E. Equifax obtained or had available these and other substantial written materials that apprised them of their duties under the FCRA. Any reasonable consumer reporting agency knows or should know about these requirements. Despite knowing of these legal obligations, Equifax acted consciously in breaching known duties regarding data security and data breaches and depriving Plaintiffs and other members of the classes of their rights under the FCRA.

66. Equifax's willful and/or reckless conduct provided a means for unauthorized intruders to obtain and misuse Plaintiffs' and Nationwide Class members' personal information for no permissible purposes under the FCRA.

67. Plaintiffs and the Nationwide Class members have been damaged by Equifax's willful or reckless failure to comply with the FCRA. Therefore, Plaintiffs and each of the Nationwide Class members are entitled to recover "any actual damages sustained by the consumer . . . or damages of not less than $100 and not more than $1,000." 15 U.S.C. § 1681n(a)(1)(A).

68.     Plaintiffs and the Nationwide Class members are also entitled to punitive damages, costs of the action, and reasonable attorneys' fees. 15 U.S.C. § 1681n(a)(2)& (3).

## COUNT V
## NEGLIGENT VIOLATION OF THE FAIR CREDIT REPORTING ACT
### (ON BEHALF OF PLAINTIFFS AND
### THE NATIONWIDE CLASS, OR, ALTERNATIVELY, PLAINTIFFS AND THE
### ALABAMA AND GEORGIA SUBCLASSES)

69. Plaintiffs restate and reallege all preceding factual allegations as if fully set forth herein.

70. Equifax was negligent in failing to maintain reasonable procedures designed to limit the furnishing of consumer reports to the purposes outlined under section 1681b of the FCRA. Equifax's negligent failure to maintain reasonable procedures is supported by, among other things, former employees' admissions that Equifax's data security practices have deteriorated in recent years, and Equifax's numerous other data breaches in the past. Further, as an enterprise claiming to be an industry leader in data breach prevention, Equifax was well aware of the importance of the measures organizations should take to prevent data breaches, yet failed to take them.

71. Equifax's negligent conduct provided a means for unauthorized intruders to obtain Plaintiffs' and the Nationwide Class members' SPI and consumer reports for no permissible purposes under the FCRA.

72. Plaintiffs and the Nationwide Class Members have been damaged by Equifax's negligent failure to comply with the FCRA. Therefore, Plaintiffs and each of the Nationwide Class Members are entitled to recover "any actual damages sustained by the consumer." 15 U.S.C. § 1681o(a)(1).

73. Plaintiffs and the Nationwide Class Members are also entitled to recover their costs of the action, as well as reasonable attorneys' fees. 15 U.S.C. § 1681o(a)(2).

## COUNT VI
## VIOLATION OF ALABAMA DECEPTIVE TRADE PRACTICES ACT
## ALA. CODE (1975) § 8-19-1 *ET SEQ.*

74. Plaintiffs restate and reallege all preceding factual allegations as if fully set forth herein.

75. Plaintiffs assert this claim on behalf of themselves and the members of the Alabama Subclass.

76. Defendant's misrepresentations, active concealment, and failures to disclose violated the Alabama Deceptive Trade Practices Act ("ADTPA") in that Defendant misrepresented that its services and products were of a particular standard, quality, and/or grade when they were of another (Ala. Code § 8-19-5(7)).

77. Plaintiffs and members of the Alabama Subclass entered into an implied contract that required Equifax to provide adequate security for the SPI it collected from their payment card transactions. As previously alleged, Equifax owes duties of care to Plaintiffs and members of the Alabama Subclass that require it to adequately secure SPI.

78. The foregoing acts and omissions of the Defendant were undertaken willfully, intentionally, and knowingly as part of its routine business.

79. Defendant's misrepresentations and omissions were material to Plaintiffs and members of the Alabama Subclass, such that a reasonable person would consider them important in deciding whether to purchase Defendant's service plans and products, and had Plaintiff and members of the Alabama Subclass known the truth, they would have acted differently.

23

80. The conduct described herein has tremendous potential to be repeated where other consumers similarly-situated will be treated with the same unscrupulous, unethical, unfair and deceptive acts and practices.

81. Furthermore, as alleged above, Equifax's failure to secure consumers' SPI violates the FTCA and therefore violates the ADTPA.

82. Equifax knew or should have known that its computer system and data security practices were outmoded and inadequate to safeguard the SPI of Plaintiffs and members of the Alabama Subclass, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

83. As a direct and proximate result of Equifax's violation of the ADTPA, Plaintiffs and members of the Alabama Subclass suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the SPI of Plaintiffs and members of the Alabama Subclass; damages arising from Plaintiffs' inability to use their debit or credit cards or accounts because those cards or accounts were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including but not limited to late fees charges and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect,

24

given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

84. Also as a direct result of Equifax's knowing violation of the ADTPA, Plaintiffs and members of the Alabama Subclass are entitled to damages as well as injunctive relief, including, but not limited to:

a) An order that Equifax engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Equifax's systems on a periodic basis, and An order Equifax to promptly correct any problems or issues detected by such third-party security auditors;

b) An order that Equifax engage third-party security auditors and internal personnel to run automated security monitoring;

c) An order that Equifax audit, test, and train its security personnel regarding any new or modified procedures;

d) An order that Equifax segment SPI by, among other things, creating firewalls and access controls so that if one area of Equifax is compromised, hackers cannot gain access to other portions of Equifax systems;

e) An order that Equifax purge, delete, and destroy in a reasonable secure manner SPI not necessary for its provisions of services;

f) An order that Equifax conduct regular database scanning and securing checks;

g) An order that Equifax routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

h) An order Equifax to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps Equifax customers must take to protect themselves.

85.     Plaintiffs assert this action on behalf of themselves and members of the Alabama Subclass for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiffs and members of the Alabama Subclass and the public from Equifax's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Equifax's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

86. Plaintiffs and members of the Alabama Subclass are entitled to a judgment against Equifax for actual and consequential damages, exemplary damages and attorneys' fees pursuant to the ADTPA, costs, and such other, further, and different relief as the Court deems just and proper.

## COUNT VII
## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
## O.C.G.A. § 10-1-390 *ET SEQ.*
## (ON BEHALF OF PLAINTIFFS AND
## THE NATIONWIDE CLASS; ALTERNATIVELY, ON BEHALF OF THE GEORGIA
## SUBCLASS)

87. Plaintiffs restate and reallege all preceding factual allegations as if fully set forth herein.

88. Equifax is engaged in, and their acts and omissions affect, trade and commerce as defined in O.C.G.A. § 10-1-392(28).

89. Equifax's acts, practices, and omissions were directed from its headquarters in Georgia.

90. Plaintiffs and Class Members entrusted Equifax with their SPI.

91. Equifax engaged in unfair or deceptive acts and practices in the conduct of consumer transactions, including the following, in violation of the GFBPA:

a. failure to utilize adequate data security practices to safeguard SPI;

b. failure to disclose that data security practices were inadequate to safeguard SPI;

c. failure to timely disclose the Data Breach to Plaintiffs and Class members;

d. continued processing and storage of SPI and continued responses to routine credit inquiries after discovery of the security vulnerabilities of the systems that were exploited in the Data Breach.

92. Equifax's failure to secure consumers' SPI violates the FTCA and the GFBPA.

93. Equifax knew or should have known that its data security practices were inadequate to safeguard the SPI of Plaintiffs and Class members, deter theft, and detect a breach within a reasonable time, and that the risk of a data breach unacceptable and uncommercially high.

94. As a proximate result of Equifax's violation of the GFBPA, Plaintiffs and Class members were damaged as follows: damages arising from unauthorized charges on debit or credit cards; damages arising from fraudulently obtained cards or financial accounts; damages arising from inability to use debit or credit cards or accounts because those cards or accounts were cancelled, suspended, or otherwise rendered unusable; late fees, charges and foregone cash back rewards; lost time and effort in placing "freezes" and "alerts" with credit reporting agencies; lost time and effort in contacting financial institutions and closing or modifying financial accounts; lost time and effort required in reviewing and monitoring credit reports and accounts; lost time and effort in filing police reports and damages from identity theft. Other forms of economic damage and injury will take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the events at issue herein

95. As a proximate result of Equifax's knowing violation of the GFBPA, Plaintiffs and Class members are entitled to damages and injunctive relief, including, but not limited to:

a. An order that Equifax hire outside security auditors and penetration testers as well as additional internal security personnel to conduct testing, including simulated attacks, penetration tests, audits on Equifax's systems on a periodic basis, and an order that Equifax promptly correct any problems or issues detected by such third-party security auditors, and that Equifax establish and maintain automated security monitoring.;

28

b. An order that Equifax engage third-party security auditors and internal personnel to run automated security monitoring;

c. An order that Equifax audit, test, and train its security personnel regarding any new or modified procedures;

d. An order that Equifax segment SPI by, among other things, creating firewalls and access controls so that if one area of Equifax is compromised, hackers cannot gain access to other portions of Equifax systems;

e. An order that Equifax purge, delete, and destroy in a reasonable secure manner SPI not necessary for its provisions of services;

f. An order that Equifax conduct regular database scanning and securing checks;

g. An order that Equifax routinely and continually conduct internal training and education to inform internal security personnel how to maintain consumers' data in a secure manner;

h. An order Equifax to meaningfully educate its customers about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps Equifax customers must take to protect themselves.

96. Plaintiffs bring this action on behalf of themselves and the members of the Georgia Subclass for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect members of the Georgia Subclass and the public from Equifax's unfair methods of competition and unfair, deceptive, fraudulent, unconscionable and unlawful practices. Equifax's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

97. Plaintiffs and members of the Nationwide Class and the Georgia Subclass are entitled to a judgment against Equifax for actual and consequential damages, exemplary damages and attorneys' fees pursuant to the GFBPA, costs, and such other further, and different relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Nationwide Class and the Alabama Subclass and the Georgia Subclass proposed in this Complaint, respectfully request that this Honorable Court enter judgment in their favor and against Equifax as follows:

a. For an Order certifying the Classes, as defined herein, and appointing Plaintiffs and their Counsel to represent the Nationwide Class and/or the Alabama Subclass and/or the Georgia Subclass;

b. For equitable relief enjoining Equifax from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class members' SPI, and from refusing to issue prompt, complete and accurate disclosures to the Plaintiffs and Class members;

c. For equitable relief compelling Equifax to use appropriate cyber security methods and policies with respect to consumer data collection, storage and protection and to disclose with specificity to Class members the type of SPI compromised;

d. For an award of compensatory and punitive damages, as allowed by law in an amount to be determined;

e. For an award of attorneys' fees costs and litigation expenses, as allowable by law;

f. For prejudgment interest on all amounts awarded; and

g. Such other, further, and different relief as this Honorable Court may deem just and proper.

## JURY TRIAL DEMAND

**Plaintiffs demand trial by struck jury.**

**Respectfully submitted this September 18, 2017.**

Steven P. Gregory
ASB-0737-R73S

OF COUNSEL FOR PLAINTIFFS:

Gregory Law Firm, P.C.
2700 Corporate Drive
Suite 200
Birmingham, Alabama 35242
Telephone 205-799-0380
email: steve@gregorylawfirm.us


Leon R. Storie, Esq.
ASB-4172-E37L
Leon Storie, Attorney at Law
2821 7th Street
Tuscaloosa, Alabama 35401
Telephone 205-737-0318
Fax 205-210-4651
email: leon@leonstorie.com

DEFENDANT TO BE SERVED VIA PROCESS SERVER

Equifax, Inc.
1550 Peachtree Street NW
Atlanta, GA 30309